# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AGNIESZKA BOESEN, *et al.*,

                 Plaintiffs,

v.

RONALD BROWN, DDS, MS, *et al.*,

                Defendants.

Civil Action No. 1:19-cv-03499-EGS

## TABLE OF CONTENTS

Table of Authorities.................................................................................i

Exhibit List .........................................................................................iii

Memorandum Of Law ...........................................................................1

   I.     Factual Background...................................................................1

   II.    Standard of Review ................................................................4

   III.   Legal Argument ......................................................................4

        a.   The Law On Medical Malpractice Actions
            In The District of Columbia. ....................................4

        b.   The Admission Of Expert Testimony Is Governed
            By *Daubert v. Merrell Dow Pharmaceuticals* And
            The Jurisprudence Of Federal Rule Of Civil Procedure 702.................6

        c.   The *Daubert* Standard As Applied To Federal
            Rules of Evidence 702 ...............................................7

        d.   Dr. Bernstein Is A Highly Qualified Expert
            Witness And There Is No Argument Advanced
            To Suggest Otherwise. ..............................................8

        e.   Dr. Bernstein's Testimony On The Standard
            Of Care Is Unchallenged. ..........................................9

   IV.   FACTUAL APPLICATION OF THE LEGAL

ARGUMENTS RAISED.................................................................10

a.  Dr. Bernstein Testified That More Likely Than Not
    Had The Standard Of Care Been Met, Dysplasia
    Would Have Been Noted In August. ........................................11

b.  Defendants' Contention That Dr. Bernstein Is
    Not Qualified To Render Causation Testimony
    In This Matter Does Not Contest Dr. Bernstein's
    Qualifications At All................................................................17

Plaintiffs' Proposed Order.................................................................23

Plaintiffs' Responses to Defendants' Statement of Undisputed Material Facts .............24

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AGNIESZKA BOESEN, *et al.*,

       Plaintiffs,

  v.

RONALD BROWN, DDS, MS, *et al.*,

       Defendants.

Civil Action No. 1:19-cv-03499-EGS

## **TABLE OF AUTHORITIES**

Case List

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). ..................................................... 4

*Ambrosini v. Labarraque*, 101 F.3d 129, 131 (D.C. Cir. 1996)............................................ 7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). ................................................. 4

*Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986)................................................................. 4

*Cleary v. Group Health Ass'n*, 691 A.2d 148, 153 (D.C. 1997)............................................ 4

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).......................................... 7

*Green v. District of Columbia Dep't of Employment Services*, 499 A.2d 870, 877 (1985) ...................... 20

*Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 795 (D.C. 2011). ................................. 5

*Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006 ......................................................... 4

*Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 10-11 (D.D.C. 2011).......................................... 6

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149, (1999)................................................... 7

*Mendes-Silva v. United States*, 980 F.2d 1482, 1488, 299 U.S. App. D.C. 39 (D.C. Cir. 1993) ....... 18

*Overseas Private Inv. Corp. v. Mandelbaum*, 1999 U.S. Dist. LEXIS 11327, *1 (June 18, 1999)....... 20

*Perkins v. Hansen*, 79 A.3d 342, 344 (D.C. 2013)................................................................. 5

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). ....................................... 4

*Scott v. Harris*, 550 U.S. 372, 380 (2007). ............................................................................ 4

*Sphere Drake Ins. PLC v. Trisko,* 226 F.3d 951, 955 (C.A.8 (Minn.)2000)).................................. 18

*Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 22-25 (5th Cir. 1974). ................... 18

*West v. Bayer Healthcare Pharms., Inc.,* 293 F. Supp. 3d 82, 94, (2018)................................. 18

*Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1144 (C.A.Va., 1980)).......... 18

Federal Rules

Fed. R. Civ. P. 56 ..................................................................................................................... 4

FRE 702 ...................................................................................................................... passim

Miscellaneous

Pattern Jury Instruction 9.01 ................................................................................... 13
Pattern Jury Instruction 9.10.................................................................................... 13

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AGNIESZKA BOESEN, *et al.*,

         Plaintiffs,

  v.

RONALD BROWN, DDS, MS, *et al.*,

         Defendants.

Civil Action No. 1:19-cv-03499-EGS

## EXHIBIT LIST

| | | |
|---|---|---|
| Exhibit 1 | Dr. Kesten Note | 2002 |
| Exhibit 2 | Dr. Rothenberg Note | 3004 |
| Exhibit 3 | Dr. Kishter Notes | 5008 & 5010 |
| Exhibit 4 | Dr. Dorrow Note | 11002 |
| Exhibit 5 | Dr. Brown Extracts | BBSCJ23 – 27.003 |
| Exhibit 6 | Mrs. Boesen Depo Extract | 120, 134 – 135 |
| Exhibit 7 | LabCorp Report | BBSCJ 32 |
| Exhibit 8 | Dr. Brown Depo | |
| Exhibit 9 | Dr. Sciubba Notes | 14004 – 05 |
| Exhibit 10: | Photograph | Sciubba 1 Exhibit from Deposition |
| Exhibit 11: | JHU Pathology Report: | 16387 |
| Exhibit 12: | Dr. Bernstein C.V. | |
| Exhibit 13 | Dr. Bernstein Report | |
| Exhibit 14 | Dr. Bernstein Transcript | |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AGNIESZKA BOESEN, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:19-cv-03499-EGS |
| RONALD BROWN, DDS, MS, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

*COME NOW* Plaintiffs, by and through undersigned counsel, and respectfully submit to this

Honorable Court their Memorandum of Points & Authorities in Opposition to Defendants' Motion

for Summary Judgment. In Opposition thereto, Plaintiffs state the following:

**I.    FACTUAL BACKGROUND**

This is a professional negligence action taken against Ronald Brown, D.D.S. as pertains to the

treatment that he rendered unto Mrs. Boesen. Mr. Boesen also has a companion claim for loss of

consortium.

The malpractice alleged is that defendant failed to diagnose a cancerous condition on Plaintiff's

tongue resulting in a subsequent serious worsening of her condition, development of cancer, and

extensive surgical intervention.

Mrs. Boesen was a 43-year-old mother of two when this incident began in 2016.  It began with

a complaint of a sensitive area on her tongue in January of 2016. Her regular dentist, Dr. Kesten noted

that she had left lateral tongue redness and that her tongue burned from time to time. (Exhibit 1:

2002). She returned to see Dr. Rothenberg on May 18, 2016 where he reported that she was having

complaints of discomfort of the left lateral tongue which she claimed had been improving and

1

decreasing in size for several days so that it was smaller when he saw her. (Exhibit 2: 3004)  He claimed that what he saw in exam was a small, vague lichen-like area of redness on the left lateral tongue, approximately 1 to 2 centimeters with no ulcerations.  The area was sensitive upon palpation.  He still suspected an allergy but indicated he would consider a biopsy if the lesion size and symptoms persisted for 2 weeks. Alternatively, if the lesion became smaller but mild symptoms were still present, still present, he would refer to oral medicine. She was then sent to see Dr. Kishter at the Maryland Oral Surgery Associates. He formulated an impression that the leukoplakic (white) lesion was due to trauma or an autoimmune condition. He did not perform a biopsy. (Exhibit 3: 5008 & 5010). In July of 2016, Mrs. Boesen was seen by a Stanley Dorrow M.D. at the Maryland Center for Dental Illness. This doctor noted that the left ventral side of the patient's tongue was irritated, and the affected area was about 20 millimeters long and 6 to 8 millimeters wide and had been a source of reported pain for about 7 months. (Exhibit 4: 11002) He noted that the filling on tooth 17 was defective and apparently rubbing the tongue.  Mrs. Boesen was referred back to Maryland Oral Surgery Associates and #17 was extracted on 7/26/16.

Mrs. Boesen was next seen at the Georgetown Oral & Maxillofacial Surgery in Washington where Defendant Dr. Ronald Brown saw her on August 30, 2016. (Exhibit 5: BBSCJ23 – 27.003). He reviewed the history of her tongue condition, noting that it was first documented in January 2016 and had not resolved following numerous treatments, including extraction of tooth #17 a month earlier. He noted a 4 cm or (0.4 cm?) X 1 cm left ventrolateral tongue lesion. He performed a 0.3 cm punch biopsy, which was submitted to LabCorps. According to Dr. Brown, it was proper to only biopsy the white area of the lesion and not the red area. As other physicians had noted a red area on her tongue, Mrs. Boesen insisted then and now that the area from which the biopsy was taken was next to the red area. Indeed, Dr. Brown did not biopsy the red area at any time. (Exhibit 6: Deposition Extract of Mrs. Boesen at 120:12 – 13; 134:15 – 135:1).

The biopsy diagnosis of the white area was lichenoid mucositis and stated that there was no evidence of high-grade dysplasia in the examined sections. (Exhibit 7: BBSCJ 32). Dr. Brown then saw Mrs. Boesen in December 2016 on follow-up visit followed by a letter to her explaining her diagnosis as lichen planus and its management. (Exhibit 5: BBSCJ25 – 27.003). He explained that lichen planus is not considered premalignant but there is an increased risk of malignancy, making regular follow-up visits advisable.  He further explained that "A biopsy procedure may be indicated to confirm the diagnosis although, lichen planus can be diagnosed clinically by experienced clinicians." He also adds that, "[h]owever, if biopsy is considered, it is necessary for the surgeon to biopsy the periphery of a lesion including some healthy tissue."  He stated "that is most helpful to include a white lesion rather than a red lesion whenever possible. Often the biopsy of red lichenoid legion will only provide information regarding non-specific information and is of limited diagnostic value."

When Dr. Brown saw Mrs. Boesen in December he admits there was a red component to the lesion, but he did not biopsy it. (Exhibit 8: Dr. Brown Deposition at p. 106)

On 5/17/17, Dr. James Sciubba saw Mrs. Boesen, who described a firm, eroded, nodular, painful lump on the left side of her left tongue that concerned her. This is the same location that she had been complaining about to Dr. Brown. Dr. Sciubba performed a punch biopsy that returned a diagnosis of invasive squamous cell carcinoma. (Exhibit 9: 14004 - 05) A photograph of the lesion made by Dr. Sciubba showed a red patch on the left lateral tongue with a vague white margin. (Exhibit 10: Sciubba 1 Exhibit from Deposition).

As a result of the pathology diagnosis, a 1 cm. cancer was excised with partial removal of the tongue at Johns Hopkins Hospital on 5/30/17. The pathology report revealed 5.7 mm of invasion and perineural invasion. (Exhibit 11: JHU Pathology Report: 16387). This diagnosis necessitated a lymph node dissection on June 13 and radiation therapy that was completed in August of 2017.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986). The relevant substantive law is used to identify the applicable material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if "a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 at 248 (1986)). An issue is genuine where the record as a whole could lead a reasonable jury to find for the nonmoving party. See *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Further, the burden of proof is on the movant to show: 1) that there is no genuine issue as to any material fact; and 2) that the movant is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). As a result, all of the evidence found in pleadings, depositions, answers to interrogatories, admissions and affidavits filed pursuant to discovery is to be viewed in the light most favorable to the non-moving party. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). All reasonable inferences drawn from the evidence should also be viewed in favor of the non-moving party, and the court may not make credibility determinations or weigh the evidence during this review. *Id.*

## III.   LEGAL ARGUMENT

### a.   The Law On Medical Malpractice Actions In The District of Columbia.

It has long been settled in this jurisdiction that "in a medical malpractice negligence action the plaintiff must present medical expert testimony to establish the standard of care, expert testimony that the defendant's conduct deviated from that standard of care, and expert testimony establishing that the alleged deviation proximately caused the plaintiff's injuries." *Cleary v. Group Health Ass'n*, 691 A.2d

148, 153 (D.C. 1997). "If the applicable standard of care is breached, the person to whom the duty is owed may recover for damages proximately caused by the negligence, including damages for physical injury, monetary loss, and ancillary or "parasitic" damages for related mental distress (sometimes referred to as 'pain and suffering')." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 795 (D.C. 2011). "In cases involving doctors, therefore, a plaintiff must present expert testimony that the doctor breached the national standard of care and must prove that this breach was reasonably likely to cause an objective person, and in fact did cause the plaintiff, to suffer serious emotional distress." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 817 (D.C. 2011).

According to the District of Columbia Court of Appeals, "[t]he causal relationship between breach and injury is established through expert testimony 'based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of plaintiff's injuries.'" *Perkins v. Hansen*, 79 A.3d 342, 344 (D.C. 2013). The *Perkins* case went on to state that it "is well established that a physician's experience may provide a reliable basis for his or her expert opinion." *Perkins v. Hanson*, at 79 A.3d 345. Similarly, this Court has stated,

> Rule 702 does not specify any particular means for qualifying an expert, requiring only that the witness possess the "knowledge, skill, experience, training, or education" necessary to "assist" the trier of fact. FED. R. EVID. 702. As the Supreme Court stated in *Daubert*, the trial court must determine whether the proposed expert possesses "a reliable basis in the knowledge and experience of [the relevant] discipline." 509 U.S. at 592. In considering whether this standard is met, courts may consider the factors articulated in *Daubert*, such as (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *Id.*

> The Supreme Court has, however, noted that the *Daubert* factors are not exclusive and may not apply in all cases. *Kumho Tire Co.*, 526 U.S. at 150-51 (noting that Rule 702 envisions a "flexible" inquiry). In cases in which the *Daubert* factors do not apply, "reliability concerns may focus on personal knowledge or experience." *Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 6 (D.D.C. 2002) [**25] (citing *Kumho Tire Co.*, 526 U.S. at 149). Formal education ordinarily suffices, and a person who holds a graduate degree typically qualifies as an expert in his

or her field. *See, e.g., Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 176-77 (5th Cir. 2010); *Am. Gen. Life. Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338-39 (11th Cir. 2009).

. . .

The degree of "knowledge, skill, experience, training, or education" required to qualify an expert witness "is only that necessary to insure that the witness's testimony 'assist' the trier of fact." *See Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981) (noting that the weight of the evidence is a matter to be assessed by the trier of fact). "[I]t is not necessary that the witness be recognized as a leading authority in the field in question or even a member of a recognized professional community." 29 FED. PRAC. & PROC. (EVID.) § 6265. "The 'assist' requirement is satisfied where expert testimony advances the trier of fact's understanding to any degree." *Id.*

*Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 10-11 (D.D.C. 2011).

### b. The Admission Of Expert Testimony Is Governed By *Daubert v. Merrell Dow Pharmaceuticals* And The Jurisprudence Of Federal Rule Of Civil Procedure 702.

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 sets up a two-part test: 1) is the witness qualified by knowledge, skill, experience, training or education; and 2) did the expert *utilize his qualifications* to employee an appropriate methodology in order to derive an opinion.

6

**c.   The _Daubert_ Standard As Applied To Federal Rules of Evidence 702**

_Daubert v. Merrell Dow Pharmaceuticals_, 509 U.S. 579 (1993) has been widely cited, interpreted, and applied as the seminal case on expert witness testimony. The D.C. Circuit has made clear that _Daubert_ "does not establish a heightened threshold for the admission of expert evidence, but rather focuses on the court's 'gatekeeper' role as a check on 'subjective belief' and 'unsupported speculation.'" _Ambrosini v. Labarraque_, 101 F.3d 129, 131 (D.C. Cir. 1996). A non-exhaustive list of traditional _Daubert_ factors includes: (1) "whether the theory or technique can be and has been tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the method's known or potential rate of error," and (4) "whether the theory or technique finds general acceptance in the relevant scientific community." _Ambrosini_, 101 F.3d at 134 (citing _Daubert v. Merrell Dow Pharmaceuticals, Inc._, 509 U.S. 579, 593-94 (1993)). While courts throughout the years have tended to focus on the catch phrase of "gatekeeping" stated in _Daubert_, it should not be lost that there is an analysis that must be undertaken in that role of "gatekeeping." Specifically, as Justice Blackmun stated,

> The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability-_of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate._

_Daubert v. Merrell Dow Pharmaceuticals_, 509 U.S. 579, 595 (1993) (emphasis added).

While _Daubert_ specifically addressed the admissibility of scientific evidence, the U.S. Supreme Court later expanded the so-called _Daubert_ test to all matters of expert testimony under Rule 702:

> We conclude that Daubert's general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability." 509 U.S. at 590. It "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." 509 U.S. at 592. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, see Part III, infra, _the trial judge must determine whether the testimony has_ **_"a reliable basis in the knowledge and experience of [the relevant] discipline_**_."_

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149, 119 S. Ct. 1167, 1175, 143 L. Ed. 2d 238, 251, (U.S. 1999) (emphasis added).

In this matter, Dr. Bernstein adequately described a reliable basis in the knowledge and experience of his discipline and employed the type of methodology accepted in that discipline to formulate his opinion on Mrs. Boesen's treatment to the extent necessary to satisfy the *Daubert* requirements. Defendants' criticism raised against Dr. Bernstein's testimony is neither a criticism over his qualifications nor his methodology; instead, Defendants' criticism is solely a dispute over the ultimate opinions that he reached. Defendants have not even proffered an expert witness or expert witness testimony to suggest that there is anything erroneous about the underlying methodology or basis that Dr. Bernstein employed in rendering his opinions in this matter. Defendants simply wish to disagree with his ultimate position – a determination for the jury to make and not the Court at this stage of litigation.

### d. <u>Dr. Bernstein Is A Highly Qualified Expert Witness And There Is No Argument Advanced To Suggest Otherwise.</u>

Dr. Bernstein, Plaintiffs' expert witness, is a board certified Oral and Maxillofacial Pathologist and Forensic Odontologist. He graduated from City College in New York in 1966 with a B.S. in Biology and Chemistry and then graduated from New York University College of Dentistry in 1970. He then conducted a residency in oral pathology at Long Beach VA Hospital and in forensic odontology at the Armed Forces Institute of Pathology.

He is currently a professor in oral pathology at the Department of Surgical and Hospital Dentistry; performs forensic dental consulting duties for the chief medical examiner in the Commonwealth of Kentucky; and is currently on the University of Louisville Hospital staff. In addition, he is a fellow of the American Academy of Oral and Maxillofacial Pathology and of the American Academy of Forensic Sciences.

In the past, he has served on the peer review committee of the Louisville Dental Society, and the Board of Directors of the American Board of Forensic Odontology. He was chairman of the examining credentialing committee of the American Board of Forensic Odontology. He has been a peer reviewer for the Journal of the American Dental Association for forensic dentistry and oral pathology, and he is licensed to practice dentistry in Kentucky, having previously been licensed in other jurisdictions where he subsequently took an inactive position, as his practice is firmly in Kentucky. He has more than a dozen publications in the field of dentistry as set forth in his curriculum vitae. (Exhibit 12). He teaches periodic continuing education courses in forensic dentistry for dentists and medical-legal personnel, sponsored by the University of Louisville and the University of Kentucky. He has taught continuing education courses in forensic dentistry and have given lectures in the same subject on numerous occasions. There can be no dispute that Dr. Bernstein is qualified to offer expert testimony that will assist the trier of fact in this matter.

### e.  Dr. Bernstein's Testimony On The Standard Of Care Is Unchallenged.

Dr. Bernstein has offered testimony to establish what the standard of care was and when Dr. Brown deviated from it. Defendants do not in dispute this testimony at any portion of their motion. While it appears that Defendant is not challenging the sufficiency of Dr. Bernstein's standard of care testimony, it is important for the Court to recognize the full breadth of the testimony as Defendant causation argument distorts the actual allegations in this case. Specifically, it is not simply Plaintiffs' claim that Dr. Brown deviated from the standard of care in August of 2016, *but also* that he deviated from the standard of care in December of 2016. Thus, there are two different time periods that are at issue.

As is made clear in Dr. Bernstein's report and his testimony as a whole, in a patient such as Mrs. Boesen who presents with a lesion of both a red and white component, the standard of care required that the red component be biopsied. (Exhibit 13: Dr. Bernstein Report). Mrs. Boesen testified

that the during the August visit the lesion was red. (Exhibit 6 at 134 - 135). Dr. Brown's August note did not describe the color of the lesion in any regard. Thus, it is Dr. Bernstein's opinion that if the jury is to believe Mrs. Boesen's testimony, the standard of care required the red portion of the lesion to have been biopsied in August. Furthermore, as pertains to the December visit:

> Q.   Okay. So it sounds like you have any opinions, they pertain to the December 16th visit, or December 15th appointment with Dr. Brown? Is that correct? Regarding standard of care that is.
>
> **A.   At that particular time.**
>
> Q.   Yeah.
>
> **A.   An isolated red-and-white lesion, getting larger, not responding to treatment, that to me – well, that's a mandatory biopsy.**
>
> . . .
>
> Q.   Doctor, so any red lesion that was present in December of 2016, it's your opinion it had to be biopsied, or did it need to have –
>
> **A.   In the context – in the context of her entire lesional experience.**

(Exhibit 14: Bernstein Tr. at 120:3 – 11 & 137:18 – 22). There is not challenge to the standard of care testimony. We are therefore left with only a challenge to the causation testimony: had the red portion of the lesion been biopsied in either August of December, within a reasonable degree of medical probability, what would it have shown and would the care, treatment, and results had been.

## IV.   <u>FACTUAL APPLICATION OF THE LEGAL ARGUMENTS RAISED</u>

While Defendants have filed and titled this motion as a summary judgment motion, the actual relief sought is more accurately described as a "*Daubert* Motion," in which Defendants are seeking to strike the testimony of Dr. Bernstein. As of this stage of the litigation, Dr. Bernstein's testimony has not been stricken by the Court. In the absence of a ruling to strike Dr. Bernstein's testimony, Defendants' Motion for Summary Judgment is devoid of any basis to grant the relief sought through

a summary judgment motion. To that end, the issues that are raised focus solely upon the admissibility of Dr. Bernstein's opinions.

Dr. Bernstein has essentially offered two opinions in this case: 1) the standard of care required Dr. Brown to have biopsied a segment of the "red" portion of the lesion; and 2) had the standard of care been met by Dr. Brown, more likely than not, a precancerous diagnosis would have been made and Mrs. Boesen would not have undergone the treatment that she ultimately did. Such testimony is enough to defeat a motion for summary judgment in this medical malpractice action.

Defendants' Motion is devoid of any attack upon Dr. Bernstein's qualifications under the first prong of the Court's analysis under F.R.E. 702 as well as any of his criticism of the standard of care deviations of Dr. Brown. Defendants are solely attempting to dispute the testimony of Dr. Bernstein as pertains to the causative effect of the deviations of the standard of care.

     a.   **Dr. Bernstein Testified That More Likely Than Not Had The Standard Of Care Been Met, Dysplasia Would Have Been Noted In August.**

The relevant causation testimony of Dr. Bernstein is found in his report and also in his deposition:

Q.    Okay. Now in your, in your report, you said that – in your opinion in this report, you said that as of August 30th, you thought there was a – that either dysplasia or superficial carcinoma was present. That was – and so I want to ask you what the basis of that opinion is.

**A.    Because cancer evolves from a benign situation. Not thoroughly benign. It's like – well, it's – it's like a bunch of terrorists who are behind a wall and can't do anything. Once the wall breaks, they can do something. So these cancer cells, these dysplastic cells are evolving and have no capabilities of behaving badly until they break through into the underlying connective tissue. So, what I think was going on was at a time and an opportunity to get a diagnosis of the evolving lesion before it became a cancer. So it may not have been cancer at that time. That would have been great, because that would have been the time to get it and prevent the cancer from ever happening. So technically, it might not have been cancer, but it most likely was an evolving cancer, not yet cancer maybe as early as the get-go, maybe as early as her first complaint. Now, by December, if we're interested in by December,**

> **whin I believe that biopsy of the red area should have occurred. I am much more confident it was already carcinoma in situ or, or cancer.**

(Exhibit 14: Dr. Bernstein Tr. At 142:4 – 143:8).

Defendants erroneously argue that Dr. Bernstein could not offer appropriate causation testimony. Defendants makes such an argument based solely on a premediated straw-man argument. Defendants even come straight out and present their straw-man argument in their memorandum at page 9 in which they state, "the issues pertaining to the three elements of dental malpractice relate to: the performance and interpretation of biopsies; the diagnosis of the tongue lesions; cancer; how tongue lesions become cancer; when, why, and how long it takes for tongue lesions to develop into cancer; how fast cancer grows; and when various treatments, including surgical interventions, are indicated for treatment of the cancer." This is not the standard upon which the Court is to rule on a motion for summary judgment.

The evidentiary standard that must be met in this matter is ***not*** on what specific date did the dysplasia or cancer form; rather, the evidentiary standard to be met by Plaintiffs is as a result of the violations of the standard of care, more likely than not and within a reasonable degree of medical certainty, what damages occurred. The D.C. Pattern Jury Instructions state the following:

### 9.01 – PROFESSIONAL LIABILITY- ELEMENTS OF CLAIM FOR MEDICAL PROFESSIONAL NEGLIGENCE

[Plaintiff] alleges that [Defendant] committed medical professional negligence. To succeed on a claim for medical professional negligence, [Plaintiff] must prove each of four elements:

1. [Defendant] should have met a standard of care.
2. [Defendant] did not meet this standard of care.
3. [Defendant's] failure to meet this standard caused [Plaintiff's] harm.
4. [Plaintiff] is entitled to damages as compensation for that harm.

[Plaintiff] must prove that each element is more likely so than not so.
If [Plaintiff] proves each element, your verdict must be for [Plaintiff]. If [Plaintiff] does not prove each element, your verdict must be for [Defendant].

### 9.10 – PROFESSIONAL LIABILITY—CAUSATION

[Plaintiff] must prove that it is more likely than not that [Defendant's] act(s), or failure(s) to act, caused the harm suffered by [Plaintiff].

An act, or failure to act, is deemed to have caused harm if it was a substantial factor in bringing about the harm. In addition, the harm must be either a direct result or a reasonably probable consequence of [Defendant's] act(s) or failure(s) to act.

If [Plaintiff] would have suffered the same harm even if [Defendant's] conduct had not been negligent, then [Defendant's] conduct is not a substantial factor in causing the harm.

(D.C. P.J.I. 9.01 & 9.10).

Defendants asked the ultimate question and even cite to Dr. Bernstein's answer at page 13 of their Memorandum; albeit, they failed to cite to the entire line of questioning, which is stated below:

> Q.  Can you state, to a reasonable degree of dental certainty, that as of August 30th Ms. Boesen had dysplasia?
>
> **A.  I'm going to go with probably. I – again, cancers behave the way cancers behave. But this was an evolving situation, and it, it – it probably was. I'm – I – I don't – I wish I didn't have to say that, because I don't know. But statistically, it probably did show dysplasia.**
>
> Q.  Well, Doctor, as of August 30th, are you saying that it's you opinion, to a reasonable degree of dental certainty, that Ms. Boesen's lesion was dysplas – had dysplasia?
>
> **A.  I believe that if a representative biopsy was made, that it would have shown some degree of epithelial alteration, and that it would have been called dysplasia. It would have been an evolving situation.**

(Exhibit 14: Dr. Bernstein Tr. at 144:11 – 145:6). This testimony on its own is sufficient to defeat summary judgment for two main reasons. First, it is important for the Court to recognize that it is undisputed that "dysplasia" is a condition that occurs before cancer; second, the identification of "dysplasia" being present as opposed to cancer being present by Dr. Bernstein specifically indicates that the failure to meet the standard of care and to have identified the dysplasia in August was a cause of the development of the cancer ultimately identified in May.

In turning to the allegation of further negligence in December, Dr. Bernstein testified that as of that time period a biopsy would have shown either dysplasia or cancer. (Exhibit 14: Dr. Bernstein

Tr. At 152:9 – 13). As pertains to the causative effects of this deviation of the standard of care, Dr.

Bernstein offered the following testimony:

> Q.   So, you say in your report, Had dysplasia or less-invasive carcinoma been diagnosed five months earlier, so that would be five months before May 17, 2017, Ms. Boesen would likely have been able to avoid the neck dissection and radiation, and might have needed less tongue surgery. So I want to know what's the basis of that opinion?
>
> **A.   Well, cancers grow. They don't explode. They grow. Many cancers have a doubling rate where, you know, once – there's a few cells, and then a certain number of months go by and then there's a doubling. And in those months when the cancer is just getting going, it's relatively small, because you double three cells, it becomes six cells. You still can't see it. Then it becomes 2 cells. Still can't see it. Once it reaches a certain size, that doubling rate starts to have a visible effect. So whatever that doubling rate was for that cancer we don't know. And it's not exactly doubling, because some of those cancer cells do die off, but it starts to evolve quickly after a certain point. And certainly my impression, my opinion is that there was at least dysplasia there by December, and once we get that cancer early, it reaches a certain threshold where if it's a certain thickness of invasion, statistically you don't have to do the neck dissection. But if it reaches a certain beyond that, it is statistically best to do a lymph node dissection. And if there's perineural invasion, that adds a little bit to it.**

(Exhibit 14: Dr. Bernstein Tr. At 155:13 – 156:19)

As a result of Dr. Bernstein having unchallenged credentials and offering appropriate expert witness testimony, Defendants have now attempted to argue that his methodology for formulating such opinions is unsound. As an initial matter, it is of note that Defendants do not offer any affidavits or support from any other expert witness to indicate that Dr. Bernstein utilized an erroneous methodology; but rather, defense *lawyers* are attempting to speak to the methodology employed by Dr. Bernstein, something which they are not qualified to do.

In making such an argument, Defendants completely discount all of Dr. Bernstein's education, training, and experience that make his qualifications as an expert witness unchallenged in this case. Dr. Bernstein even testified that it was his education, training, and experience that supported his opinions:

14

Q.      Okay. So what is the scientific basis for you saying that in August of 2016, Ms. Boesen had dysplasia?

**A.      The objective scientific information is by virtue of experience. I don't have an article that can tell me that I'm at the – she has dysplasia. I don't have a biopsy that tells me she has dysplasia on that date. I just have my opinion that if a biopsy was done on a representative area on that date, it would have shown dysplasia.**

Q.      All right. And if I understand correctly, the sole basis of, of that opinion is what you're saying is your experience. There's no other basis for that opinion; is that correct?

**A.      My experience, my education and training.**

Q.      Well, specifically, what experience, education or training allows you to render an opinion that there was dysplasia in August of 2016?

**A.      Well, because I've seen cancers evolve from dysplasia. I've seen enough of them to have a, an opinion that can't be vetted in pure science. For the same token, I can't say that a day before Dr. Sciubba's biopsy, I can't say that she didn't have can – that she – maybe she didn't have cancer a day before, but that's ridiculous. Okay? So we're getting into – we're getting into something where you're asking me because of lack of absolute proof, that' you're preventing me from saying that something is ridiculous. And I just – my opinion has to mean something, because we all, as dentists, treat patients and make the right calls most of the time.**

Q.      Sure. And so I'm just trying to get, you known, any, you know, factual or scientific basis for that opinion. Is there anything else that you can tell me to support the opinion – that supports your opinion that in August of 2016, Ms. Boesen had dysplasia, other than what you've already said?

**A.      You know, medicine and dentistry has always been an applied science. It's the art in science. Anything that we've done to progress is because we use that. We don't and can't have experiments, human experiments where we take large groups of people and let their cancers or leukoplakias or erythroplakias evolve and biopsy them every month. We can't ever find that out. We have to go with our best, our best evidence.**

(Exhibit 14: Dr. Bernstein Tr. at 149:15 – 151:21). While Defendants erroneously insist that Dr. Bernstein's answer creates a purely speculative opinion, they fail to consider what his "education, training, and experience" consists of. Of particular note, they also fail to consider that at the outset of his deposition, Dr. Bernstein cited to "The Diagnosis and Management of Chronic Nonspecific

Mucosal Lesions" published in the <u>California Dental Association Journal</u>, Vol. 27, No. 4, April 1999; "Biopsy Technique Pathological Considerations" published in <u>The Journal of American Dental Association</u>, Vol. 96, March 1978; Michael Kahn's "The ADA Practical Guide to Soft Tissue Oral Disease" published by the <u>American Dental Association</u>, at pages 43, 52, 53, 129 – 131; Sook Bin Woo's article called "Oral Epithelial Dysplasia and Premalignancy" published in <u>Head and Neck Pathology</u>, as well as William G. Shafer and Charles A. Waldron's article "Erythroplakia of the Oral Cavity" published in the journal <u>Cancer</u>, Vol. 36, Number 3, September 1975. He also cited to another article by Shafer and Waldron titled "Leukoplakia Revisited: A Clinical Pathologic Study 3,526 Oral Leukoplakias" that was also published in <u>Cancer</u>, Vol. 36, page 1386, October 1975. Additionally, when it came to being questioned on literature pertaining to oral cancer, oral lesions, diagnosis of oral cancer and lesions or performance of biopsies, Dr. Bernstein again offered up such literature of Sol Silverman, M.D. as far back as the 1980's. (Exhibit 14: Dr. Bernstein Tr. at 30:9 – 31:4 & 45:21 – 49:1). Dr. Bernstein also addressed other literature in the field that demonstrated the pattern of growth of dysplastic lesions. (Exhibit 14: Dr. Bernstein Tr. at 101:3 – 104:6). Dr. Bernstein's opinion did not simply come out of thin air; rather, he utilized the research and tools in the medical community that form the basis for understanding the genesis and development of oral cancers and applied the facts of this case to that medical knowledge basis.

Unlike the *Frye-Reed* test, which the Court is aware was the precursor to the *Daubert* test, it is not a requirement that an expert witness be able to identify a specific article that states exactly what it is they are going to testify. Instead, *Daubert* asks the Court to look at first and foremost the witness' qualifications and then to glean from those qualifications if the expert has utilized the appropriate methodology to formulate his opinions. In this case, Dr. Bernstein not only utilized the appropriate methodology, but he even went a step further and identified various sources of the basis of his

16

methodology with numerous publications that he has pulled from in developing his opinions. This is hardly *ipse dixit* testimony as Defendants would have the Court believe.

Dr. Bernstein is also the course director for advanced oral pathology (Exhibit 14: Dr. Bernstein Tr. at 33:1 – 7); and he teaches Oral Pathology, Advanced Oral Pathology, and General Pathology while giving lectures on forensics, and other areas. (Exhibit 14: Dr. Bernstein Tr. at 34:5-18). Aside from teaching and conducting research, he attends profession meetings including two pathology meetings a year and one forensics meeting a year. (Exhibit 14: Dr. Bernstein Tr. at 34:19 – 35:11).

This is exactly what a medical expert witness is to do in such a case where the claim of negligence is the defendant's failure to gather the appropriate information at the appropriate time. The expert is to look at all the facts, apply the facts to the medical knowledge of the relevant field; and formulate an opinion. That is what Dr. Bernstein did. That is also why we have a trial by jury system to weigh the evidence presented by both sides and determine what more likely than not happened. Had Dr. Brown met the standard of care and we had the appropriate pathology to review, we would not be in the Court system as he would have either acted within the appropriate standard of care and treated the issue timely, or he would have clearly violated the standard of care and worked to resolve the matter before suit was filed. (Or, *potentially*, the tests would have shown no dysplasia and no lawsuit would have been filed.) Plaintiffs are not obligated to prove absolute certainty in this case as the Defendants assert; Plaintiffs need only prove that had the standard of care been met, more likely than not and within a reasonable degree of medical certainty, Mrs. Boesen would not have suffered the medical care and damages that she ultimately did suffer.

   **b.  Defendants' Contention That Dr. Bernstein Is Not Qualified To Render Causation Testimony In This Matter Does Not Contest Dr. Bernstein's Qualifications At All.**

Defendants argue at subpoints 2 and 3 of their motion that Dr. Bernstein is not qualified to offer certain opinions; however, Defendants do not in any way contest Dr. Bernstein's qualifications

or offer any expert testimony to conflict with his methodology and opinions. Instead, Defendants are attempting to assert that there is a requirement that a plaintiff must present "the best expert" in order to testify; that is not the law in the District of Columbia.

Defendants present irrelevant questions and answers during Dr. Bernstein's deposition as an erroneous basis to assert a challenge on his qualifications. Defendants have not challenged the manner in which Dr. Bernstein has arrived at his opinions, but only that they believe his conclusions to be based upon incomplete factual predicates.  ("The asserted fallibility of the expert's assumptions affected the weight of his testimony, not its admissibility. See *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 22-25 (5ᵗʰ Cir. 1974)." *Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1144 (C.A.Va., 1980))("Attacks on the foundation for an expert's opinion, as well as the expert's conclusions, go to the weight rather than the admissibility of the expert's testimony.") *Sphere Drake Ins. PLC v. Trisko,* 226 F.3d 951, 955 (C.A.8 (Minn.)2000)).

While Defendants assert that Dr. Bernstein should be disqualified from offering causation testimony because he stated that he could not indicate what the doubling rate was for Mrs. Boesen's cancer, the reason for such a statement is because Dr. Brown failed to adhere to the standard of care to gather more than one data point in order to calculate the doubling rate. Thus, it is not a question of whether Dr. Bernstein is qualified to offer such an opinion; but rather there is insufficient data in order to provide such testimony. The doubling rate, however, is not a requirement for Dr. Bernstein to render such opinions: "Absolute certainty in a causation opinion is not necessary. *See Mendes-Silva v. United States*, 980 F.2d 1482, 1488, 299 U.S. App. D.C. 39 (D.C. Cir. 1993) (holding that the fact 'that no scientific evidence exists which *conclusively* establishes [a] causal link' is not a 'bar to the admissibility of . . . expert opinion on causation.') (emphasis in original)." *West v. Bayer Healthcare Pharms., Inc.,* 293 F. Supp. 3d 82, 94, (2018).

Additionally, Defendants cite to Dr. Bernstein's inability to give a date certain as to when neck dissection and radiation would not have been needed. This question, however, is not relevant as Dr. Bernstein is not required to offer testimony with absolute specificity and is not required to give a date certain as to when the damages occurred. Dr. Bernstein is simply required to offer testimony within a reasonable degree of medical probability as to whether the negligent conduct was a cause of the resulting damages. Dr. Bernstein's causation testimony is clearly within the admissible category of expert opinions.

What Defendants are attempting to do with this argument is shift the burden of proof of the affirmative defense of a pre-existing injury upon Plaintiffs. However, it is not Plaintiffs' burden to disprove Defendants' affirmative defenses in Plaintiffs' case-in-chief. Defendants have asserted that the cause of Mrs. Boesen's damages were the result of numerous affirmative defenses. Specifically, Defendants identified in their Answer the following Affirmative Defenses:

- Third Defense:        Any injury, loss, or damages that may have been sustained by Plaintiffs were directly caused by the superseding, intervening acts and omissions of a third party or third parties for which Defendant is not responsible nor liable.

- Fifth Defense:        Any injury, loss, or damages that may have been sustained were the result of an independent, intervening agency or instrumentality over which Defendant had no control or right of control.

- Seventh Defense:        To the extent that Plaintiffs are injured as alleged, said injuries were caused in whole or in part by persons/entities other than this Defendant.

- Eight Defense:        If Plaintiffs were injured as alleged, the injuries were caused by an underlying medical/dental condition and not by any act or inaction on the part of this Defendant.

(ECF Doc. No. 16).

As stated by the District of Columbia Court of Appeals,

The burden of proving an affirmative defense rests with the party asserting it. *Weaver v. Du Pont*, 119 A.2d 716, 717 (D.C. 1956); *Tendler v. Jaffe*, 92 U.S. App. D.C. 2, 6, 203 F.2d 14, 18 (on rehearing), *cert. denied*, 346 U.S. 817, 98 L. Ed. 344, 74 S. Ct. 29 (1953); *see also National Rifle Ass'n v. Ailes*, 428 A.2d 816, 821 (D.C. 1981) (qualification of agreement entitling employee to right to monetary compensation for accumulated leave); *Marshall v. District of Columbia*, 391 A.2d 1374, 1380 (D.C. 1978) (justification and legal authority for false arrest and battery); *Pekofsky v. Blalock*, 175 A.2d 604, 605 (D.C. 1961) (statute of limitations); *Callaway v. Hamilton Nat'l Bank of Washington*, 90 U.S. App. D.C. 228, 235, 195 F.2d 556, 562-63, (1952) (apparent authority, estoppel and laches).

*Green v. District of Columbia Dep't of Employment Services*, 499 A.2d 870, 877 (1985) *See also Overseas Private Inv. Corp. v. Mandelbaum*, 1999 U.S. Dist. LEXIS 11327, *1 (June 18, 1999).

Thus, once Plaintiff has presented the appropriate testimony of Dr. Bernstein that dysplasia was present in August and December and that the failure to timely diagnose the dysplasia was a cause of the formation of the cancer and required treatment thereafter, the burden is upon Defendant to prove that the cancer was already present. Defendants may present their own experts to offer such an opinion; however, that would simply be a difference of opinions for which the jury is required to make a factual finding. Differing opinions on the ultimate question of fact is a question to be determined by the fact finder, not to be decided by the Court through a summary judgment motion.

**WHEREFORE**, Plaintiffs respectfully requests that this Honorable Court deny Defendant's Motion for Summary Judgment, or in the alternative, to grant a "*Daubert* Hearing" to rule upon the admissibility of Dr. Bernstein's opinions.

Respectfully submitted,

/s/Matthew A. Nace
Barry J. Nace, Esq. #130724
Matthew A. Nace, Esq. #1011968
Paulson & Nace, PLLC
1025 Thomas Jefferson St., NW
Ste 810
Washington, DC 20007
bjn@paulsonandnace.com
man@paulsonandnace.com
202-463-1999 Tel.
202-223-6824 Fax
*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of November, 2021, a true copy of the foregoing

*Memorandum of Points & Authorities in Opposition to Defendants' Motion for Summary Judgement* was filed via

the Court's ECF system to:

Edwin L. Keating, III, Esq.
Baxter, Baker, Sidle, Conn & Jones, P.A.
120 East Baltimore Street
Suite 2100
Baltimore, MD  21202
Phone: (410) 230-3800
Fax: (410) 230-3801
Email Address: elk@bbsclaw.com
*Attorney For: Dr. Brown*


/s/Matthew A. Nace
Matthew A. Nace, Esq.