**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

AGNIESZKA BOESEN and

CHRISTIAN BOESEN,

        Plaintiffs,

v.

RONALD S. BROWN, DDS, MS,

et al.,

        Defendants.

Civ. Action No. 19-3499
        (EGS)

---

## MEMORANDUM OPINION

### I.  Introduction

Plaintiffs Agnieszka Boesen ("Mrs. Boesen") and Christian Boesen ("Mr. Boesen", and together with his wife "Plaintiffs") initiated this suit against Defendant Ronald S. Brown, DDS, MS, ("Dr. Brown" or "Defendant") for dental care that Dr. Brown administered to Mrs. Boesen. Their medical malpractice claim alleges that had Dr. Brown properly biopsied and diagnosed Mrs. Boesen's tongue lesion as tongue cancer in either August or December of 2016, she would have avoided a neck dissection and radiation therapy. Pending before the Court is Dr. Brown's Motion for Summary Judgment. *See* Def.'s Mot. Summ. J., ECF No.

1

41.[1] Upon careful consideration of the pending motion, the opposition, the reply thereto, the applicable law, and the entire record therein, the Court **DENIES** Dr. Brown's Motion for Summary Judgment.

## II.  Background

Mrs. Boesen began experiencing tongue irritation in early 2016.[2] Pls.' Ex. 6 ("Boesen Dep."), ECF No. 42-9 at 4. In February, her dentist noted a "soft tissue lesion of the left lateral border of the tongue" and suspected an allergic reaction. Pls.' Ex. 2, ECF No. 42-5 at 2. She followed up in May when her symptoms reappeared and was referred to an oral surgery doctor. *Id.*; Pls.' Ex. 3, ECF No. 42-6 at 2. The oral surgery doctor evaluated Mrs. Boesen in June and July and concluded that her lesion was due to trauma or an autoimmune issue. Pls.' Ex. 3, ECF No. 42-6 at 2. In mid-July, Mrs. Boesen was referred to another doctor, who noted that the "left ventral side" of Mrs. Boesen's tongue was irritated, "has been a source of pain for

---

[1] When citing electronic filings throughout this Opinion, the Court refers to the ECF page numbers, not the page numbers of the filed documents.

[2] This factual background is based primarily on the parties' statements of material facts, which are undisputed unless otherwise indicated. *See* Def.'s Statement of Material Facts Not in Dispute, ECF No. 41-3; Pls.' Resp. Def.'s Statement of Material Facts Not in Dispute ("Pls.' SOMF"), ECF No. 42-3; Def.'s Reply Counter-Statement Disputed Facts, ECF No. 43-2. Where necessary to provide adequate context, the Court includes other undisputed facts from the record.

about 7 months," and despite visiting "several dentists and physicians to treat this problem[,] . . . no one has offered a definitive treatment plan." Pls.' Ex. 4, ECF No. 42-7 at 2. That doctor suspected the irritation stemmed from a defective filling on one of Mrs. Boesen's teeth. *Id.* Mrs. Boesen had the tooth extracted. Pls.' Ex. 5 ("Brown Notes"), ECF No. 42-8 at 2.

After the extraction failed to alleviate her symptoms, Mrs. Boesen consulted Dr. Brown at Georgetown Oral & Maxillofacial Surgery. *Id.* On August 30, 2016, Dr. Brown examined Mrs. Boesen and noted a "whitish plaque approximately 4 cm by 1 cm of the left lateral/ventral border" of her tongue.[3] *Id.* at 3. He performed a "punch biopsy" of the lesion in order to diagnose the issue and "Rule-out Squamous Cell Carcinoma." *Id.* The biopsy was sent to LabCorp for analysis and returned a diagnosis of "lichenoid mucositis" and stated that "differential diagnostic possibilities include lichen planus and lichenoid drug eruption." Pls.' Ex. 7, ECF No. 42-10 at 2. The report concluded that "there is no evidence of high grade dysplasia," which is a pre-cancer. *Id.*

---

[3] The parties dispute whether Mrs. Boesen's lesion was also red in August. *See* Pls.' Ex. 8 ("Brown Dep."), ECF No. 42-11 at 109 ("The first time that I saw the lesion, it was a white lesion."); Boesen Dep., ECF No. 42-9 at 4 ("I was pointing to my red lesion and telling him that that's where I'd been hurting, and I've had all the discomfort for the last eight months.").

Mrs. Boesen returned to Dr. Brown on December 15, 2016, with the same complaint. He noted that this time she had an area of "redness" on "the left lateral border of the tongue" and that the results of the August biopsy "reported a histologic diagnosis of lichenoid mucositis." Brown Notes, ECF No. 42-8 at 6. Dr. Brown then officially diagnosed Mrs. Boesen with "Licehenoid mucositis/Oral Lichen planus," which is an "autoimmune condition." *Id.* at 6-7. He noted that while "Oral Lichen Planus is not pre-malignant," "there is an increased risk of malignancy associated with the condition" and so "regular follow-up visits are advocated." *Id.* at 7. He concluded that a "biopsy procedure may be indicated to confirm the diagnosis although lichen planus can be diagnosed clinically by experienced clinicians." *Id.* at 8. He claimed that if a biopsy is considered, "it is necessary for the surgeon to biopsy the periphery of a lesion including some healthy tissue," that "[i]t is most helpful to include a white lesion rather than a red lesion whenever possible," and that "biopsy of a red lichenoid lesion . . . is of limited diagnostic value." *Id.* He provided Mrs. Boesen with steroids to alleviate her symptoms. *Id.* at 6.

Five months later, Mrs. Boesen sought treatment from Dr. Sciubba for a firm, eroded, painful lump on her tongue in the same area where Dr. Brown treated her. Pls.' Ex. 9, ECF No. 42-12 at 2. Dr. Sciubba performed a biopsy, which returned a

4

diagnosis of "invasive squamous cell carcinoma." *Id.* He then referred her to head and neck surgeon Dr. Mydlarz for treatment. Pls.' SOMF, ECF No. 42-3 ¶ 23. On May 30, 2017, Dr. Mydlarz performed a partial glossectomy to remove the lesion from Mrs. Boesen's tongue. *Id.* ¶ 5. The depth of invasion of the tumor was 5.7 mm and therefore Dr. Mydlarz recommended a neck dissection to ensure the cancer had not spread to Mrs. Boesen's lymph nodes. *Id.* at ¶¶ 7, 9. Mrs. Boesen agreed; Dr. Mydlarz performed the dissection, which confirmed that the cancer had not spread to the lymph nodes. *Id.* ¶ 9. She also had post-operative radiation because of the depth of invasion of the tumor. *Id.* ¶ 10.

In 2019, Mrs. Boesen and her husband[4] filed the current medical malpractice suit against Dr. Brown.[5] Compl., ECF No. 1-1 at 4, 6. Discovery, including Rule 26(a)(2) Disclosures for Expert Witnesses, concluded at the end of August 2021. Joint Status Report, ECF No. 39 at 1. Dr. Brown moved for summary judgment in October 2021. Def.'s Mem. P. & A. Supp. of Summ. J.

---

[4] This suit also includes Mr. Boesen's companion claim for loss of consortium, which is not at issue in this Motion for Summary Judgment. Compl., ECF No. 1-1 at 7.

[5] The case was removed to this Court from the Superior Court of the District of Columbia based on diversity jurisdiction. Notice of Removal, ECF No. 1 at 2-4. Plaintiffs' suit initially included the laboratory that analyzed Mrs. Bosesen's August 2016 biopsy as a defendant. Compl., ECF No. 1-1 at 4. However, the parties later stipulated to the dismissal of the lab as a defendant. Minute Order (Apr. 28, 2020).

("Def.'s Mot."), ECF No. 41-1. Plaintiffs submitted their memorandum in opposition that November. Pls.' Mem. P. & A. Opp. Def.'s Mot. Summ. J. ("Pls.' Opp."), ECF No. 42-1. Dr. Brown submitted his reply the following month. Def.'s Mem. P. & A. Supp. Reply Pls.' Resp. Opp. Mot. Summ. J. ("Def.'s Reply"), ECF No. 43-1. The motion is now ready and ripe for adjudication.

## III. Standard of Review

Federal Rule of Civil Procedure 56 requires the Court to grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A "material" fact is one that could "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the burden of "informing the district court of the basis for its motion" as well as "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted); *see also* Fed. Civ. P. 56(c)(1)(A). To defeat

6

summary judgment, the nonmoving party must "designate specific facts showing that there is a genuine issue [of material fact] for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). Either party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed R. Civ. P. 56(c)(2).

In evaluating a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255. The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

## IV. Analysis

Under District of Columbia law, "[i]n a negligence action predicated on medical malpractice, the plaintiff must carry a tripartite burden, and establish: (1) the applicable standard of care; (2) a deviation from that standard by the defendant; and (3) a causal relationship between that deviation and the plaintiff's injury." *Washington v. Wash. Hosp. Ctr.*, 579 A.2d 177, 181 (D.C. 1990). "Because these issues are distinctly related to some science, profession, or occupation, expert testimony is usually required to establish each of the elements, except where the proof is so obvious as to lie within the ken of

the average lay juror." *Id.* (internal quotation marks and citations omitted).

In moving for summary judgment, Defendant offers three arguments, all concerning the opinions of Plaintiffs' sole expert witness, Dr. Mark L. Bernstein ("Dr. Bernstein"). First, Defendant argues that Dr. Bernstein "cannot provide the admissible evidence needed by Plaintiffs to establish the element of causation." Def.'s Mot., ECF No. 41-1 at 9. Second, Defendant claims that "Plaintiffs have not demonstrated the existence of any causation evidence that is related to the December 15th appointment." Def.'s Reply, ECF No. 43-1 at 12. And finally, Defendant argues that Plaintiffs fail to provide any evidence "that Dr. Brown breached the standards of care when he provided treatment to Ms. Boesen" on either August 30 or December 15. *Id.* at 6-9. Since a court ruling on a motion for summary judgment can only consider admissible evidence, the Court begins by determining whether Dr. Bernstein's expert testimony on causation is admissible.

## A. Admissibility of Dr. Bernstein's Expert Opinion

Although state law determines when expert testimony is required in a negligence action, Federal Rule of Evidence 702 governs the admissibility of such evidence. *See Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102, 1108 (D.C. Cir. 2012). It states:

> A witness who is qualified as an expert by
> knowledge, skill, experience, training or
> education may testify in the form of an
> opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized
> knowledge will help the trier of fact to
> understand the evidence or to determine a fact
> in issue; (b) the testimony is based on
> sufficient facts or data; (c) the testimony
> is the product of reliable principles and
> methods; and (d) the expert has reliably
> applied the principles and methods to the
> facts of the case.

Fed R. Evid. 702. Under Rule 702, trial judges serve as
gatekeepers to ensure that the methodology underlying the expert
testimony is valid and the expert's conclusions are based on
"good grounds." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S.
579, 590 (1993). A district court has "broad discretion in
determining whether to admit or exclude expert testimony."
*United States ex rel. Miller v. Bill Harbert Int'l Constr.,
Inc.*, 608 F.3d 871, 895 (D.C. Cir. 2010) (internal quotation
marks omitted).

As Plaintiffs note in their brief, *see* Pls.' Opp., ECF No.
42-1 at 15; challenges to expert testimony are usually brought
in a motion *in limine* or "*Daubert* motion" during pretrial
proceedings. *See Sloan v. Urban Title Servs., Inc.*, 770 F. Supp.
2d 227, 238 (D.D.C. 2011) ("The proper vehicle for raising
[challenges to a proposed expert's qualifications] is a motion
*in limine* filed in the context of pretrial proceedings and, if
necessary, the Court shall consider a request that a *Daubert*

hearing be held to evaluate [the expert's] proffered
testimony.").

In this district, when such challenges are brought within
motions for summary judgment, judges have "expressed concern"
over the "premature" nature of the motion, urging that "'the
*Daubert* regime should be employed only with great care and
circumspection at the summary judgment stage.'" *Carmichael v.
West*, No. 12-1969, 2015 WL 10568893, at *7 (D.D.C. Aug. 31,
2015) (quoting *Cortés-Irizarry v. Corporación Insular de
Seguros*, 111 F.3d 184, 188 (1st Cir. 1997)). This caution
reflects concerns that "'except when defects are obvious on the
face of a proffer,'" courts may "'exclude debatable scientific
evidence without affording the proponent of the evidence
adequate opportunity to defend its admissibility.'" *Id.* (quoting
*Cortés-Irizarry*, 111 F.3d at 188). Overall, the decision whether
to "conduct the reliability and helpfulness analysis that
*Daubert* and Rule 702 require in the context of a summary
judgment motion" and ultimately "to exclude expert testimony
found wanting from its consideration in ruling on the [summary
judgment] motion" is within the discretion of the court. *Id.*
(internal quotation marks omitted); *see also Landmark Health
Sols., LLC v. Not for Profit Hosp. Corp.*, 950 F. Supp. 2d 130,
138 (D.D.C. 2013) ("Trial courts are afforded substantial
latitude in deciding the procedure necessary to test the

sufficiency of a potential expert . . . ." (internal quotation marks omitted)).

In this case, most of Defendant's briefing concerns the admissibility of Dr. Bernstein's testimony. *See generally* Def.'s Mot., ECF No. 41-1; Def.'s Reply, ECF No. 43-1. Accordingly, both parties have fully examined the issues and Plaintiffs have been given adequate opportunity to defend admissibility. The Court will therefore conduct the *Daubert* and Rule 702 analysis, keeping in mind the broader context of summary judgment. *See Arsanjani v. United States*, No. 19-1746, 2023 WL 3231101, at *3 (deciding to "weigh the Rule 702 factors as [the Court] normally would" because the "experts have had ample opportunity to defend their reports in depositions appended to the briefing here" and the Court did not "find their testimony to be on a subject so overly scientific or complex that an additional hearing would alter the admissibility analysis").

Defendant's admissibility arguments are confined to Dr. Bernstein's causation opinions. In Plaintiffs' brief, they summarize that opinion as "had the standard of care been met by Dr. Brown, more likely than not, a precancerous diagnosis would have been made and Mrs. Boesen would not have undergone the treatment that she ultimately did." Pls.' Opp., ECF No. 42-1 at 16; *see also* Pls.' Ex. 13 ("Bernstein Report"), ECF No. 42-16 at

4 ("It is within a reasonable degree of probability that a premalignant condition (dysplasia) or superficial carcinoma was present at the time that Dr. Brown did his biopsy [in August 2016]. . . . In my opinion, within a reasonable degree of medical probability, had Dr. Brown's initial biopsy shown the true nature of the disease, excisional surgery could have been performed 5 months earlier, preventing the need for neck dissection and radiation."). Defendant argues that Dr. Bernstein was "unable to provide the testimony needed to demonstrate that [his causation] opinions are reliable or that . . . he is properly qualified to render them." Def.'s Mot., ECF No. 41-1 at 10. The Court takes each of these arguments in turn.

### 1. Reliability

In challenging reliability, Defendant questions both Dr. Bernstein's methods and the sufficiency of the facts and data underlying his causation opinions. *See* Def.'s Mot., ECF No. 41-1 at 14 (claiming that Dr. Bernstein "is unable to present any methodology for rendering [his] opinion"); *id.* at 18 (listing all the details Dr. Bernstein "does not know" about the formation of Mrs. Boesen's cancer).

Courts have substantial "latitude [both] in deciding *how* to test an expert's reliability" and in deciding "*whether* that expert's relevant testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). In conducting the inquiry,

a court must focus solely on "principles and methodology, not on the conclusions that they generate." *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 (D.C. Cir. 2001) (quoting *Daubert*, 509 U.S. at 595). When evaluating methodology for scientific validity, a court may consider where relevant: "(1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the method's known or potential rate of error; and (4) whether the theory or technique finds general acceptance in the relevant scientific community." *Ambrosini v. Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996). If an expert is "relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note.

A court should not exclude testimony that "merely represent[s] a weak factual basis," which is "appropriately challenged on cross examination." *Heller v. District of Columbia*, 952 F. Supp. 2d 133, 140 (D.D.C. 2013); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Rather, the court's

gatekeeping role is to exclude expert "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," that is, when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Beginning with methodology, Defendant claims that Dr. Bernstein is "unable to present any methodology for rendering [his causation] opinion and when asked about his personal experience to render it testified that it 'can't be vetted in science.'" Def.'s Mot., ECF No. 41-1 at 14. Defendant then concludes that because there is "no methodology to challenge," Def.'s Reply, ECF No. 43-1 at 16; Dr. Bernstein's opinions are "*ipse dixit*," *id.*, and "amount to nothing more than pure conjecture and speculation on his part and are completely unreliable," Def.'s Mot., ECF No. 41-1 at 14.

Plaintiffs respond that "Dr. Bernstein's education, training, and experience" form the basis of his causation opinions. Pls.' Opp., ECF No. 42-1 at 19. And that he conducted his analysis by "look[ing] at all the facts, apply[ing] the facts to the medical knowledge of the relevant field; and formulat[ing] an opinion," which is "exactly what a medical expert witness is to do in such a case where the claim of

negligence is the defendant's failure to gather the appropriate information at the appropriate time." *Id*. at 22.

Based on a thorough analysis of the record, the Court agrees with Plaintiffs. When asked the basis for his opinion that Mrs. Boesen had dysplasia in August 2016, Dr. Bernstein responded, "[m]y experience, my education[,] and training." Pls.' Ex. 14 ("Bernstein Dep."), ECF No. 42-17 at 152. When probed for specifics, Dr. Bernstein replied that he could render an opinion about when Mrs. Boesen first developed dysplasia because he's "seen cancers evolve from dysplasias." *Id.* He then explained that "medicine and dentistry has always been an applied science," *id.* at 153; that his opinion was based on his "knowledge of how cancer evolves," *id.* at 154; and that it "can't be vetted in pure science" because he has a "lack of absolute scientific proof" regarding the formation of Mrs. Boesen's dysplasia, *id.* at 152. However, he definitively stated that "[i]t is my opinion that in August . . . based upon my experience, based upon all the patients that I've seen in 35 years, based upon what I've read, that this lesion was probably at least dysplasia at that [time] in August. And then more likely than that, because it evolves, in December." *Id.* at 150-51. Based on the full context of this testimony, Dr. Bernstein's equivocations relate only to being unable to definitively prove, "in pure science," that Mrs. Boesen had dysplasia at a certain

time. This concern speaks to the degree of confidence Dr.

Bernstein has in his conclusions,[6] not the methodology he

employed in generating them. In making his argument, Defendant

omits the word "pure" from Dr. Bernstein's quote to claim that

Dr. Bernstein is actually commenting on his methodology, as one

that "can't be vetted in science," Def.'s Mot., ECF No. 41-1 at

14. The Court rejects this distortion of the record as a reason

to discredit Dr. Bernstein's causation opinions.

   Furthermore, Dr. Bernstein's testimony establishes that his

opinions are sufficiently grounded in his experience, education,

and training to satisfy *Daubert* and Rule 702. His qualifications

include "teaching of pathology and oral pathology to . . .

dental students and . . . residents," Bernstein Dep., ECF No.

42-17 at 18; "see[ing] clinical patients . . . [for] 45 years of

---

[6] To establish a *prima facie* case for negligence claims for
medical malpractice in D.C., a Plaintiff must prove each element
by a "preponderance of the evidence." *Rhodes v. United States*,
967 F. Supp. 2d 246, 287 (D.D.C. 2013) (citing *District of
Columbia v. Price*, 759 A.2d 181, 183 (D.C. 2000)). Expert
opinions on causation must establish to "'a reasonable degree of
medical certainty, that the defendant's negligence is more
likely than anything else to have been the cause (or a cause) of
the plaintiff's injuries.'" *Id.* at 303 (quoting *Giordano v.
Sherwood*, 968 A.2d 494, 502 (D.C. 2009)). "[A]bsolute certainty
is not required . . . ." *Sponaugle v. Pre-Term, Inc.*, 411 A.2d
366, 367 (D.C. 1980). Since Dr. Bernstein's equivocations are
about absolute certainty, as opposed to "a reasonable degree of
medical certainty," the Court also rejects Defendant's claim
that Dr. Bernstein "concedes that he cannot render [his
opinions] to a reasonable degree of dental certainty." Def.'s
Mot., ECF No. 41-1 at 14.

. . . practice at the dental school," *id.* at 44; "doing research, [to] keep[] up with . . . [his] responsibilities as an educator," *id.* at 33; going to "two pathology meetings each year, and one forensics meeting each year," *id.* at 37; and "writ[ing] the board examinations in oral pathology that . . . students take," *id.* at 78. When asked about research "[i]n this case, for purposes of rendering opinions," Dr. Bernstein replied that he reviewed "articles that [he] wrote" and "textbooks" to see "if they addressed this particular problem," *id.* a 45; and then proceeded to list the names of several publications and the page numbers he consulted.[7] *Id.* at

---

[7] Plaintiffs cite these publications and Dr. Bernstein's qualifications in their brief, *see* Pls.' Opp., ECF No. 42-1 at 20-22. Defendant in his reply brief claims that Dr. Bernstein's "curriculum vitae and the information contained in it are hearsay and not supported by affidavit or other admissible evidence." Def.'s Reply, ECF No. 43-1 at 12. He also "objects to the statements from Dr. Bernstein's curriculum vitae," *id.* at 13 n.2; and "objects to the publications that Plaintiffs cite," *id.* at 13 n.3. The Court notes that Plaintiffs are not attempting to bolster Dr. Bernstein's testimony with additional information, but rather Plaintiffs are drawing the Court's attention to the publications and qualifications that Dr. Bernstein testified to in the same deposition that Defendant quotes at length in his briefs. *See* Pls.' Opp., ECF No. 42-1 at 20 (stating that Dr. Bernstein discussed the publications "at the outset of his deposition"); *id.* at 22 (citing where in Dr. Bernstein's deposition he discussed each qualification). For this reason, the Court does not agree that such information is not admissible evidence. Furthermore, to the extent Defendant argues that "Dr. Bernstein's testimony directly contradicts the argument that Plaintiffs attempt to make about those publications," Def.'s Reply, ECF No. 43-1 at 13; inconsistencies in testimony are the purview of cross-examination, going to the weight of the

46-50. Dr. Bernstein also noted that he "reviewed . . . [the] medical records" in this case as well as the depositions of Dr. Brown and Mrs. Boesen. *Id.* at 67-68.

In connecting his training to his opinions in this case, Dr. Bernstein referenced the articles and materials he consulted while giving his opinions. For example, discussing the relevance of the color of Mrs. Boesen's lesion, Dr. Bernstein testified that "being red is always more scary than being white. The articles that I . . . gave to you for review will explain that." *Id.* at 113. He also stated that "[a] white lesion . . . on the tongue has a 25 percent chance statistically of being premalignant or malignant. Dysplasia or cancer. That will be seen in one of the reports that I gave you." *Id.* at 148. In discussing Mrs. Boesen's case specifically, he noted that "it was a single isolated lesion, a red and white lesion in a high-risk area for oral cancer" and thus he did not share Dr. Brown's conclusion that the lesion was "lichen planus." *Id.* at 116. These examples, alongside the list of publications Dr. Bernstein discussed in his testimony, indicate that he both possessed and utilized his expertise in oral pathology to evaluate the facts of Mrs. Boesen's case and render an opinion. Discussing and then applying established medical knowledge to the facts of a

---

testimony and not its admissibility. *See Daubert*, 509 U.S. at 596.

specific case is a common practice for rendering an expert opinion. *See West v. Bayer HealthCare Pharm. Inc.*, 293 F. Supp. 3d 82, 91 (D.D.C. 2018) ("Plaintiffs' experts are infectious disease doctors who have applied their education, experience and knowledge of infectious diseases to the information available to them about a patient and, based on that information, have chosen what they believe is the most likely cause of that patient's illness over all other possibilities. This type of medical diagnosis—while obviously not infallible—is a reliable, scientific manner of generating an expert opinion."). Thus, the Court does not agree that Dr. Bernstein was "unable to present any methodology for rendering an opinion," Def.'s Mot., ECF No. 41-1 at 14. *See Arsanjani*, 2023 WL 3231101, at *6 ("an expert need not employ a rigorous analytical methodology if the expert is instead qualified on the basis of his or her practical experience or training" (internal quotation marks omitted)).

Often intertwined with his argument about methodology, Defendant challenges the reliability of Dr. Bernstein's opinions by pointing to all the information Dr. Bernstein "does not know." Def.'s Mot., ECF No. 41-1 at 18. Since Rule 702 requires that expert testimony be "based on sufficient facts or data," Fed. R. Evid. 702(b), the Court addresses this argument as a separate challenge to Dr. Bernstein's testimony on the grounds that he was without sufficient facts or data to render his

opinion. *See* Def.'s Reply, ECF No. 43-1 at 11-12 (claiming that an admitted lack of knowledge about the doubling rate of Mrs. Boesen's cancer is "an admission by Plaintiffs that Dr. Bernstein is without the 'data' he needs to render a causation opinion about the December 15th appointment").

Essentially, Defendant argues that Dr. Bernstein is not able to claim that "had dysplasia or a less invasive carcinoma been diagnosed 5 months earlier[,] Ms. Boesen would likely have been able to avoid the neck dissection and radiation and might have needed less tongue surgery," because he "does not know when the cancer first formed, how fast it grew, [and] when it reached a point when it required a neck dissection or radiation therapy." Def.'s Mot., ECF No. 41-1 at 18 (internal quotation marks omitted). Plaintiffs respond that they are "not obligated to prove absolute certainty in this case," Pls.' Opp., ECF No. 42-1 at 22; and that "[t]he evidentiary standard that must be met in this matter is *not* on what specific date did the dysplasia or cancer form; [but] rather, . . . as a result of the violations of the standard of care, more likely than not and within a reasonable degree of medical certainty, what damages occurred," *id.* at 17.

The Court again agrees with Plaintiffs. Beginning with Dr. Bernstein's opinion that Mrs. Boesen had dysplasia on her first

visit to Dr. Brown, Defendant implies that knowing when the lesion began to be precancerous is a prerequisite to forming such an opinion. Certainly, if Dr. Bernstein knew the moment the cancer formed or even how fast it grew, this would provide a strong basis for his opinion—perhaps even certainty—that Mrs. Boesen had dysplasia when Dr. Brown examined her in either August or December 2016. But such knowledge is not necessary to form that opinion or to render that opinion admissible. *See West*, 293 F. Supp. 3d at 93 ("Where two highly experienced and knowledgeable infectious disease doctors opine about the most likely bacterial cause of a patient's infectious disease based on all of the facts surrounding his history and clinical presentation, those opinions are not subject to exclusion simply because they are not also confirmed by tests that *definitively prove* the presence of that bacteria." (emphasis added)). Rather, those facts, would only strengthen (or undermine) Dr. Bernstein's opinion. And thus, they go to the weight of his opinion instead of its admissibility.

As Dr. Bernstein noted in his testimony, "cancers grow" and they "start[] to evolve quickly after a certain point" when the "doubling rate starts to have a visible effect." Bernstein Dep., ECF No. 42-17 at 157-58. He further noted that Mrs. Boesen's "isolated red-and-white lesion, getting larger, not responding to treatment" was such a visual indication of potential

pathology. *Id.* at 122. And that therefore "[a]t the time that
the lesion was symptomatic and evolving, there is a darn good
chance that it was at least dysplasia." *Id.* at 148. These
markers, although certainly not definitive scientific proof that
Mrs. Boesen had dysplasia when she was examined by Dr. Brown,
are sufficient to sustain Dr. Bernstein's *opinion*. They
establish that Mrs. Boesen was presenting symptoms of pathology
on her tongue when she first saw Dr. Brown and that because
those symptoms did not abate with time or treatment dysplasia
was likely the underlying cause. Although the data does not
definitively prove Dr. Brown's opinions, the Court cannot
conclude that there is "too great an analytical gap between the
data and the opinion proffered." *See Mendes-Silva v. United
States*, 980 F.2d 1482, 1488 (D.C. Cir. 1993) (holding that an
expert witness "acknowledging that no scientific evidence exists
which *conclusively* establishes [a] causal link" is not a "bar to
the admissibility of . . . expert opinion on causation").

   Defendant also argues that Dr. Bernstein cannot render
reliable causation testimony about the subsequent treatment Mrs.
Boesen received because he was "unable to provide an answer [to]
any questions about when Ms. Boesen needed to have a neck
dissection and radiation therapy." Def.'s Mot., ECF No. 41-1 at
17. The Court disagrees. First, this statement is belied by the
record. Dr. Bernstein explained that at a "certain thickness of

invasion" of the tumor on the tongue, "it is statistically best
to do a lymph node [or neck] dissection." Bernstein Dep., ECF
No. 42-17 at 158. He also testified that the range of such
invasion is "about three to five millimeters in thickness,"
which is a "boilerplate" range that is "in the textbooks of oral
pathology." *Id.* at 159-60. Dr. Bernstein then read from and
provided a citation to a textbook that supported his claim. *Id.*
at 161-63. Second, the parties agree that at the time the tumor
was extracted in May 2017, "the depth of invasion of the tumor
was 5.7 [mm]." Pls.' SOMF, ECF No. 43-2 ¶ 7. This depth of
invasion alongside the earlier testimony that Mrs. Boesen's
lesion exhibited markers of dysplasia during both her visits to
Dr. Brown suffice as "sufficient facts or data" to underlie Dr.
Bernstein's opinion that an earlier diagnosis of the cancer by
Dr. Brown would have allowed Mrs. Boesen to avoid neck surgery.

Thus, the Court disagrees with Defendant's claim that Dr.
Bernstein's causation opinions are "*ipse dixit*," Def.'s Reply,
ECF No. 43-1 at 16; or "nothing more than pure conjecture and
speculation on his part," Def.'s Mot., ECF No. 41-1 at 14.

### 2. Qualifications

Rule 702 allows an expert witness to be qualified by their
"knowledge, skill, experience, training, or education." Fed R.
Evid. 702. A court qualifying an expert witness must conclude

that the proposed expert possesses "a reliable basis in the knowledge and experience of [the relevant] discipline." *Daubert*, 509 U.S. at 592. Judges in this circuit have noted that "[w]hile a person who holds a graduate degree typically qualifies as an expert in his or her field, such formal education is not required." *Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 196 (D.D.C. 2015) (internal quotation marks and citation omitted). Furthermore, "[c]onclusory statements that an expert is qualified because of his education or experience is insufficient for a court to find that the witness is indeed qualified to offer his expert opinion." *Arias v. DynCorp*, 928 F. Supp. 2d 10, 25 (D.D.C. 2013).

Although Defendant claims throughout his briefs that Dr. Bernstein is "not qualified" to render the proffered opinions, Defendant does not dispute Dr. Bernstein's credentials. Rather, solely challenging Dr. Bernstein's opinion regarding causation, Defendant points to the fact that Dr. Bernstein is not "trained to perform glossectomies," does not "perform radiation," and that "with regard to the neck dissection and when that's indicated . . . the surgeons make that ultimate decision." Def.'s Mot., ECF No. 41-1 at 17-18.

In the context of Dr. Bernstein's extensive credentials and the exact details of his causation opinion, the Court does not

agree that Dr. Bernstein is not qualified to render his causation opinions. Dr. Bernstein's causation opinion was summarized in Plaintiffs briefs as: "had the standard of care been met by Dr. Brown, more likely than not, a precancerous diagnosis would have been made and Mrs. Boesen would not have undergone the treatment that she ultimately did." Pls.' Opp., ECF No. 42-1 at 16. It is undisputed that Mrs. Boesen's treatment included a partial glossectomy, neck dissection, and radiation. *See* Pls.' SOMF, ECF No. 42-3 ¶¶ 5, 6, 10. Experience in *performing* the treatment Mrs. Boesen ultimately received is not a prerequisite for forming an opinion about *when* that treatment is necessary.

Dr. Bernstein's opinion is limited to claiming that a misdiagnosis—stemming from an error in Dr. Brown's performance of the biopsy in August 2016, *see* Bernstein Dep., ECF No. 42-17 at 116 ("the misconception of red versus white biopsy, that's the area where I think is the . . . issue") and his subsequent failure in December to perform a second biopsy, *see id.* ("That would have been an instant biopsy, a re-biopsy.")—caused subsequent treatment. Dr. Bernstein has extensive credentials to qualify him to render this conclusion. First, as noted above, Dr. Bernstein has been teaching oral pathology and seeing clinical patients, specifically for oral pathology and "oral lesions," for decades. *Id.* at 18, 98. His patients often come

with "concerns that [a pathology] could be cancer." *Id.* at 22.
Second, Dr. Bernstein also teaches a class on "[w]hen it's
appropriate to do a biopsy," "[h]ow much tissue," and "[w]hat
they do with the biopsy once they actually cut the biopsy out."
*Id.* at 30. Third, as noted above, the decision to "do the neck
dissection" is based on "a certain thickness of invasion" and
that standard is "boilerplate" at 3-5 mm of invasion. *Id.* at
158-60. And finally, Dr. Bernstein testified that about half of
his patients "have continued problems with dysplasia or follow-
up for cancer." *Id.* at 108. Therefore, Dr. Bernstein has
extensive experience with performing biopsies on oral lesions
and diagnosing oral lesions as benign, cancerous, or
precancerous dysplasia. And while he may not "make the ultimate
decision" for when a neck dissection is warranted, his
experience with patients who have continued problems with
dysplasia and oral cancer establish that he is familiar with the
treatments of those pathologies even if he does not perform such
treatments himself. Furthermore, from his teaching experience,
Dr. Bernstein is familiar enough with typical treatments for
oral cancer to know when a certain thickness of invasion will
warrant a neck dissection. Thus, the Court concludes that Dr.
Bernstein is qualified to render his causation opinions.

Overall, the Court rejects Defendant's claim that he is
entitled to summary judgment because Plaintiffs' expert witness

Dr. Bernstein "cannot provide the admissible evidence needed by Plaintiffs to establish the element of causation for a *prima facie* claim of dental malpractice," Def.'s Mot., ECF No. 41-1 at 9.

### B. Sufficiency of Causation Evidence

In his reply brief, Defendant claims for the first time that Plaintiffs do not provide "legally sufficient evidence to demonstrate the element of causation for a *prima facie* case of dental malpractice" for Mrs. Boesen's December appointment with Dr. Brown. Def.'s Reply, ECF No. 43-1 at 11. Defendant claims that Dr. Bernstein's testimony fails to meet the requirements for "legally sufficient" evidence because it: (1) "does not even mention that appointment or the care that Dr. Brown rendered at it"; (2) "is not an opinion that is 'based on a reasonable degree of medical certainty'"; and (3) "does not state that it is Dr. Bernstein's opinion that the treatment that Dr. Brown provided to Ms. Boesen on that date is more likely than anything else, the cause (or a cause) of her alleged injuries." *Id.*

This argument is analytically distinct from Defendant's previous argument regarding the admissibility of Dr. Bernstein's causation testimony. Although both focus on the element of causation, this new argument claims that even if Dr. Bernstein's testimony were admissible, it fails to establish the element of

causation as a matter of law. *See Arsanjani*, 2023 WL 3231101, at
*3 (explaining that one Defendant sought summary judgment by
challenging the "admissibility of expert testimony" while
another Defendant "presse[d] an alternative route to judgment,"
claiming that "even if admissible, [the expert's] report and
testimony would be insufficient as a matter of law" to establish
an element of the *prima facie* case).

"[I]t is well established that district courts need not—
and, indeed, generally should not—consider arguments raised for
the first time in a reply brief." *Pauling v. District of
Columbia*, No. 13-0943, 2015 WL 13891312, at *2 (D.D.C. June 15,
2015); *see also Benton v. Laborers' Joint Training Fund*, 121 F.
Supp. 3d 41, 51-52 (D.D.C. 2015) (citing cases). The prudential
concerns behind this practice are that: (1) considering such
arguments "would be manifestly unfair" to the opposing party who
"has no opportunity for a written response" and (2) "it would
risk the possibility of an improvident or ill-advised opinion,
given our dependence as an Article III court on the adversarial
process for sharpening the issues for decision." *Herbert v.
Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992)
(internal quotation marks omitted).

Defendant's argument about the sufficiency of causation
evidence implicates these twin concerns. Nothing in Defendant's

opening brief would put Plaintiffs on notice that they must show precisely where in the record Dr. Bernstein stated his December 15 causation opinions, his belief that his opinion was "based on a reasonable degree of medical certainty," or that he believed Dr. Brown's negligence was, "more likely than anything else," the cause of Mrs. Boesen's injuries. Plaintiffs' brief focused on the admissibility of Dr. Bernstein's testimony—his methodology and credentials—and did not include the extraneous information Defendant now seeks in its challenge. *See* Pls.' Opp., ECF No. 42-1 at 19-24. Furthermore, although the Court is likely familiar enough with Dr. Bernstein's testimony to rule on this argument, it is reluctant to do so without Plaintiffs' input on the legal issues in order to avoid "an improvident or ill-advised opinion."

Therefore, the Court declines to consider Defendant's argument about the legal sufficiency of Plaintiffs' causation evidence regarding Mrs. Boesen's December appointment with Dr. Brown.

### C. Sufficiency of Standard of Care Evidence

Similarly, Defendant claims for the first time in his reply brief that Plaintiffs failed to provide expert opinion testimony that Dr. Brown breached the standards of care in either August or December. Def.'s Reply, ECF No. 43-1 at 6, 8. For the August

appointment, Defendant claims that Dr. Bernstein does not "ever state that it is his opinion that . . . Dr. Brown breached the standards of care on August 30th" because "it is not an opinion that he holds in this case." *Id.* at 6. For the December appointment, Defendant claims that Dr. Bernstein's testimony about the standard of care is not "legally sufficient" because he is "expressing his personal opinion about what he would have done, not an opinion about what was required by the national standards of care." *Id.* at 8. Although Defendant attempts to stylize this claim as a failure of "causation evidence," *id.* at 7, 9; the arguments are in substance a challenge to the sufficiency of evidence for a separate element of Plaintiffs' malpractice claim—breach of the standard of care—and thus are new arguments first raised in Defendant's reply brief.

Although, as noted above, district courts usually do not address arguments first raised in reply briefs, the prudential concerns underlying that general rule are not implicated for these claims. First, although Plaintiffs in their brief noted that the "standard of care is unchallenged," they nevertheless offered evidence in the record that substantiated their claims on the standard of care because they found it "important for the Court to recognize the full bread of the testimony." Pls.' Opp., ECF No. 42-1 at 14. Because Plaintiffs have submitted their view

of the sufficiency of the standard of care evidence, considering Defendant's arguments would not be "manifestly unfair."

Second, although Defendant claims to be making, in part, an argument about the "legal sufficiency" of the evidence proffered on the standard of care, his claim boils down to a factual dispute about what evidence is or is not in the record. For example, relating to the August appointment, Defendant is not disputing Dr. Bernstein's familiarity with the standard of care or what that standard is. Rather, Defendant is challenging whether there is any evidence in the record that Dr. Bernstein holds the opinion that Dr. Brown breached the standard in August. Thus, the Court does not conclude that a ruling on such narrow, factual claims would provide an "improvident or ill-advised opinion." The Court will therefore address Defendant's arguments regarding the standard of care.

### 1. August Appointment

Defendant first claims that Plaintiffs cannot provide "expert opinion testimony to establish that Dr. Brown breached the standards of care on August 30th" because that opinion is "not an opinion that [Dr. Bernstein] holds in this case." Def.'s Reply, ECF No. 43-1 at 6-7. To substantiate his argument, Defendant quotes from Dr. Bernstein's testimony. When asked, "[c]an we agree, Doctor, based on the information that you know and that you're aware of at this point in time, that you are

31

without sufficient information to render the opinion that on August 30th Dr. Brown breached the standard of care with respect to the treatment that he provided and the biopsy he took of Ms. Boesen," Dr. Bernstein responded, "I cannot render an opinion based upon my speculation. I can't tell you what he saw." *Id.* at 7 (quoting Bernstein Dep., ECF No. 47-12 at 119-20).

Plaintiffs in their brief claim that Dr. Bernstein's report and testimony conclude that "in a patient such as Mrs. Boesen who presents with a lesion of both a red and white component, the standard of care required that the red component be biopsied" and Dr. Brown did not conduct that biopsy. Pls.' Opp., ECF No. 42-1 at 14.

Looking at the record as a whole, the Court again agrees with Plaintiffs. In Dr. Bernstein's report, he states that Dr. Brown "should have known that the red area [of Mrs. Boesen's lesion] was more likely to show these diagnostic changes than the white area, yet [Dr. Brown] specifically avoided the best representative site for the cancer to be found." Bernstein Report, ECF No. 42-16 at 4. In his deposition, Dr. Bernstein elaborates on this conclusion and states that Dr. Brown's "misconception of red versus white biopsy, that's the area where I think is the . . . issue." Bernstein Dep., ECF No. 42-17 at 116. He explains, "if you think it's lichen planus and you want to make the case for lichen planus, you take a white component.

32

And if you want to rule out cancer, you get the red component. Ergo, you take both. You take a piece that contains both red and white." *Id.* at 127. He later restates this opinion:

> [Y]ou're not taking a biopsy to prove it's lichen planus. You're taking a biopsy to find out what it is and to rule out cancer. And if your objective is to rule out cancer, you need to take a red lesion. If all you care about is lichen planus, then you take a white lesion for such, and you take that red lesion to rule out the possibility of a dysplasia or cancer. Because [Mrs. Boesen] had nothing in her . . . mouth that even resembled lichen planus clinically.

*Id.* at 140. He also noted that Dr. Brown did not take a biopsy of the red component and even "sent [Mrs. Boesen] a letter that said he would not biopsy a red component;" thus, Mrs. Boesen "was not going to get the biopsy *she needed* from him." *Id.* at 135 (emphasis added). Applying summary judgment standards and taking all reasonable inferences in Plaintiff's favor, this testimony is sufficient to show that Dr. Bernstein believed Dr. Brown deviated from the standard of care in August 2016 by failing to perform a biopsy on the red portion of Mrs. Boesen's lesion.

Defendant's argument fails to persuade the Court otherwise. Although the quoted portions from Defendant's brief are accurate representations of Dr. Bernstein's testimony, they do not undermine the Court's conclusion that Dr. Bernstein holds the opinion that Dr. Brown breached the standard of care in August.

33

When Dr. Bernstein stated, "I cannot render an opinion based upon my speculation. I can't tell you what he saw," Bernstein Dep., ECF No. 42-17 at 122; this response was in the context of Defendant's counsel repeatedly asking Dr. Bernstein whether he "still h[e]ld the opinion that on August 30th, the lesion that Dr. Brown saw, the four-by-one centimeter lesion was red and white," *id.* at 117-18. Dr. Bernstein repeatedly stated that he didn't know and "will never know . . . what [Dr. Brown] saw at that time." *Id.* at 118. Defendant's counsel then, over the objection of Plaintiffs' counsel, concluded that Dr. Bernstein's opinion "is not an opinion that [he could] render without engaging in speculation," and Dr. Bernstein replied again, "I do not know what Dr. Brown saw." *Id.* at 119. The Federal Rules of Evidence do not require experts to testify from personal knowledge. *See* Fed. R. Evid. 602. Thus, Dr. Bernstein's lack of knowledge of the color of Mrs. Boesen's lesion in August is not fatal to his opinion testimony and Defendant is not entitled to summary judgment on this ground.

### 2. December Appointment

Defendant claims that Dr. Bernstein's testimony "does not establish legally sufficient evidence that Dr. Brown breached the standards of care when he provided treatment to Ms. Boesen on December 15th" because his statement "makes clear, that he is expressing his personal opinion about what he would have done,

not an opinion about what was required by the national standards
of care." Def.'s Reply, ECF No. 43-1 at 8. Looking at the record
as a whole, the Court again disagrees.

First, in Defendant's own statement of facts, he claims
that "Dr. Bernstein stated in his deposition that the standard
of care required a biopsy be taken on December 15, 2016," citing
to the portion of Dr. Bernstein's testimony that Defendant now
challenges. Pls.' SOMF, ECF No. 42-3 ¶ 46. While this portion of
the record indeed includes Dr. Bernstein's statement that "to
me—well, that's a mandatory biopsy," Bernstein Dep., ECF No. 42-
17 at 122; other portions of Dr. Bernstein's testimony confirm
that he is speaking about an established national standard
rather than a personal one. Earlier in his testimony, Dr.
Bernstein states: "I have a rule that says you have a lesion
that does not go away after you've tried to treat it—it's *not my
rule. This is the rule.* Okay? This is—*this is a maxim in oral
pathology.* You have a mucosal lesion that doesn't go away after
you've tried to treat it in a couple of weeks, it gets
biopsied." *Id.* at 111 (emphases added). Furthermore, Dr.
Bernstein testified that, applying this rule to Mrs. Boesen's
case in December, after the lesion "is not getting any better
with the steroid treatment" prescribed by Dr. Brown in August,
"[t]hat would have been an instant biopsy, a re-biopsy." *Id.* at
115-16. Thus, Dr. Bernstein's testimony in full context

35

establishes that he believes Dr. Brown violated an established standard—as he put it, "a maxim in oral pathology"—when Dr. Brown did not re-biopsy Mrs. Boesen's lesion. Therefore, taking the evidence as a whole and rendering all reasonable inferences in Plaintiffs' favor, the Court does not conclude that Dr. Bernstein's testimony spoke only to his own, personal standards.

Because Defendant has failed to establish as a matter of law that Plaintiffs' evidence on a breach of the standard of care in either August or December is insufficient, the Court declines to grant summary judgment on this ground.

## V.    Conclusion

For the foregoing reasons, the Court **DENIES** Defendant's Motion for Summary Judgment, *see* ECF No. 41.

An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **November 14, 2023**